**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 25-cr-00105-NYW

UNITED STATES OF AMERICA,

Plaintiff,

v.

COOPER FREDERICK,

Defendant.

---

**MOTION TO SUPPRESS EVIDENCE OBTAINED AND DERIVED FROM FLOCK**

---

Defendant Cooper Frederick, by and through counsel, Kelly L. Page, Richard K. Kornfeld and Liz DeLay of Recht Kornfeld, P.C., respectfully moves this Court to suppress evidence obtained and derived through law enforcement's use of the Flock automated license plate reader mass surveillance system, in violation of the Fourth Amendment's prohibition against unreasonable searches and seizures. In support of said Motion, Defendant states as follows:

## I. Factual Background

### *a. Flock*

Flock Safety is a private company that provides law enforcement with a powerful surveillance system comprised of high-resolution automated license plate reader ("ALPR") cameras that can be installed on roadways and that continuously scan, photograph, and catalog vehicles wherever they travel. The resulting database enables law enforcement to search, surveil, and retrospectively reconstruct the movements of vehicles – and by extension, the people who operate them – across time and jurisdictions, whether or not the driver is suspected of a crime, and without the use of a warrant. Unlike traditional license plate readers, which simply record a

license plate number, Flock's high-resolution imaging and artificial intelligence machine learning technology captures and logs not just text from license plates, but also what Flock terms the "vehicle fingerprint": plate number, make, model, color, body type, and unique identifiers such as bumper stickers, roof racks, toolboxes, and body damage, allowing law enforcement to search a vast database using plain language and visual descriptors, and retrieve matching vehicles along with the exact date, time, GPS coordinates, and images associated with each Flock camera capture. With the proliferation of Flock cameras – amplified by their use and integration with other traffic surveillance systems – law enforcement can track the entirety of a person's movements from point A to point B, including the precise route traveled. Further, law enforcement can add vehicle fingerprints and images to Flock "Hotlists" – daily updated lists of vehicles of interest that are then automatically compared against every license plate scanned by Flock cameras. When a match is detected, the system generates an alert, allowing the cameras to conduct continuous, detailed automated searches for police without requiring a manual search of the database.

*b. Loveland Police Department's Use of Flock*

The Loveland Police Department ("LPD") has contracted with Flock since 2022. As of April 7, 2026, LPD has deployed 29 Flock ALPR cameras, which are supplemented with at least 97 other traffic cameras. Positioned along nearly every major artery in Loveland, these cameras continuously scan, record, and catalog the movements of the public at an unprecedented scale. In the first twenty-four days of March 2026 alone, LPD's Flock surveillance cameras scanned 1,604,540 unique license plates at an average of approximately 120,439 license plate scans a day.[1] Additionally, Flock has access to and can search Flock's statewide and national database.

[1] The data from the remaining days in March 2026 were unavailable to the defense when drafting this motion.

*c. LPD's use of Flock in the identification and apprehension of Mr. Frederick.*

On March 7, 2025, LPD officers received a report from a Tesla Dealership that a person had thrown a "Molotov cocktail" toward the dealership before running away. The suspect was observed on company video surveillance wearing a cap, face mask, brown jacket, and gray pants which officers believed matched the description of two previous graffiti incidents at the Tesla dealership on February 28, 2025, and March 3, 2025.

LPD Detective Hines checked intersection camera footage following the graffiti incident on February 18, 2026, and purportedly saw a small red SUV, believed to be a Mazda, with a distinctive silver roof rack, at the intersection of Monroe Avenue and Eisenhower Blvd, nearly a mile away from the dealership. Without any indication that the suspect entered a vehicle, or any other basis connecting the red SUV to the offense, Detective Hines tracked it through the city using Flock and other traffic cameras. Thereafter, on March 13, 2025, Detective Hines happened to overhear that ATF Special Agent Burkett had a video of a red vehicle "leaving the area" of the Tesla arson incident on March 7, 2025, and, after looking at intersection cameras, purportedly recognized the vehicle as the same one she had previously followed by Flock and traffic cameras on February 18, 2025.

LPD officers systematically utilized Flock's mass surveillance capabilities to focus their investigation on Mr. Frederick. Numerous LPD officers queried Flock 132 times for red Mazda SUVs in Loveland over the preceding month, leading officers to a red Mazda SUV captured by a Flock camera approximately three miles away from the Tesla in the early morning hours of March 3, 2025. The Flock camera identified the license plate of the red Mazda as CUS-052, which LPD officers then entered into Flock's "hotlist" for "Tesla Arson Vehicles of Interest." Using this information, officers were able to determine the vehicle was registered to Cooper Frederick.

Officers then reviewed body-worn camera footage from prior traffic stops involving Mr. Frederick, concluding Mr. Frederick's physical description and clothing matched those of the Tesla suspect.

Subsequently, officers conducted a targeted search of the Flock network for Mr. Frederick's vehicle over a 30-day period, without a warrant or any other judicial oversight, allowing them to retrospectively monitor and reconstruct his movements during the month preceding the incidents. That search revealed 72 separate occasions of Flock capturing Mr. Frederick's vehicle. Agents then used Flock and other traffic cameras to trace Mr. Frederick's movements, which they allege put Mr. Frederick's Mazda around the Tesla dealership near the time of the March 3, 2025, graffiti incident. Relying on this Flock information, officers executed search warrants on Mr. Frederick's vehicle and residence mere hours after initiating their Flock investigation.

On March 27, 2025, Mr. Frederick was indicted and arrested on one count of arson, in violation of Section 18 U.S.C. § 844(i), and one count of illegal possession of a destructive device, in violation of Title 26 U.S.C. §§ 5861(d) and 5871.

## II. Legal Argument

### *a. Mr. Frederick has a reasonable expectation of privacy in the whole of his physical movements and location history. Accordingly, law enforcement's search of the Flock system for his movements constituted a Fourth Amendment search.*

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. AMEND. IV. Its protections are intended "to safeguard the privacy and security of individuals against arbitrary invasions by governmental officials" and "to place obstacles in the way of a too permeating police surveillance." *Carpenter v. United States*, 585 U. S. 296, 303-05 (2018) (citing *Camara v. Municipal Court of City and County of San Francisco*, 387 U. S. 523 528 (1967)); *United States*

*v. Di Re,* 332 U. S. 581, 595 (1948); *Chatrie v. United States*, 225 L. Ed. 2d 793, 807-08 (2026). A government intrusion constitutes a search when it invades a privacy interest that an individual has sought to keep private and that society recognizes as objectively reasonable. *Carpenter,* 585 U.S. at 304. Absent an exception, such a search requires a warrant supported by probable cause. *Id.* Whether an expectation of privacy counts as legitimate is "less the result of any fixed set of rules" than of "guideposts" stretching back to the Fourth Amendment's beginnings. *Chatrie,* 225 L. Ed at 807-08.

Recently, the Supreme Court has been tasked with reconciling these founding principles with new, emerging technologies and surveillance tools that have "enhanced the Government's capacity to encroach upon areas normally guarded from inquisitive eyes." *Carpenter*, 585 U.S. at 305 (quoting *Kyllo v. United States*, 533 U.S. 27, 34 (2001)). In doing so, the Supreme Court has become increasingly wary of technologies that enable broad, indiscriminate government surveillance, particularly of individuals' location information. That concern is evident in both *Carpenter* and *Chatrie*, where the U.S. Supreme Court reaffirmed that the "progress of science" cannot come at the expense of the Fourth Amendment's protections. *Carpenter*, 585 U.S. at 320; *Chatrie*, 225 L. Ed. 2d at 821; *Olmstead v. United States*, 277 U.S. 438, 473–74 (1928) (Brandeis, J., dissenting).

In *Carpenter*, the Supreme Court held that the Government obtaining cell-site location data capable of revealing the movements of an individual over time constitutes a Fourth Amendment search requiring a warrant supported by probable cause. 585 U.S. at 313, 317. The Supreme Court emphasized that "[a] person does not surrender all Fourth Amendment protection by venturing into the public sphere" and affirmed that a person has a reasonable expectation of privacy in the whole of their physical movements, particularly where location information is "detailed, encyclopedic,

and effortlessly compiled." *Carpenter,* 585 U.S. at 309-310; *United States v. Jones*, 565 U. S. 400, 406 (2012) (holding that GPS monitoring of a person's car was a search). Furthermore, the Court expressed concerns about the "retrospective quality of the data" in which the Government could "travel back in time to retrace a person's whereabouts" without needing to know "in advance whether they want to follow a particular individual, or when," because "[w]hoever the suspect turns out to be, he has effectively been tailed every moment of every day for five years, and the police may—in the Government's view—call upon the results of that surveillance without regard to the constraints of the Fourth Amendment." *Id.* at 312. The Supreme Court also declined to apply the third-party doctrine, recognizing a "special solicitude for location information in the third-party context." *Id.* at 315. The Court reasoned that, "in no meaningful sense does the user voluntarily assume the risk of turning over a comprehensive dossier of his physical movements" when the technology generating that information – cell phones- are "a pervasive and insistent part of daily life" *Id.* at 315.

The Supreme Court has continued to recognize the heightened privacy concerns associated with location information, most recently reaffirming its "special solicitude for location information" and extending Fourth Amendment protections to Google Location History data in *Chatrie*. In that case, police investigating an armed robbery obtained a geofence warrant requiring Google to provide information about cellphones located near the crime scene during a two-hour window to "find out who was there and so who might have done it." 225 L.Ed. 793, 808. The Supreme Court held that law enforcement's access to the defendant's location data was indeed a search subject to Fourth Amendment protections regardless of the fact that the information was held by a third-party tech company and that the information was only requested within a limited period of time. *Id.* Like in *Carpenter,* the Court expressed significant concern with law

enforcement's ability to "reconstruct retrospective[ly], and with no real effort, people's comings and goings in any area." *Id.* at 811. For these reasons, in both *Carpenter* and *Chatrie,* the Supreme Court recognized a right of privacy in location information such that the Government's acquisition of that information constitutes a search under the Fourth Amendment.

That same logic can be extended to law enforcement's search of Mr. Frederick's location data over a period of thirty days through the use of the Flock surveillance system. In *Chatrie*, the Supreme Court noted "[t]he resemblances between CSLI and Location History, in their relationship to personal privacy, practically leap off the page." 225 L. Ed at 810. So too does a person's location history as scanned and catalogued by Flock. Here, like law enforcement's search of cellphones located near the crime scene in *Chatrie*, law enforcement utilized the Flock surveillance network to search for any vehicles in the general area of the Tesla dealership spanning over a month, from February 2, 2025, to March 14, 2025. Through 132 searches of the Flock database, law enforcement was able to narrow their investigation to Mr. Frederick and, like cell site location information in *Carpenter,* create a "detailed, encyclopedic, and effortlessly compiled" catalog of Mr. Frederick's movements over a thirty-day period in which Mr. Frederick was unwittingly and unwillingly captured by Flock cameras 72 times. With this information, as in *Chatrie* and *Carpenter,* law enforcement transformed a single investigative lead into a detailed map of Mr. Frederick's movements and a month-long retrospective catalog of his locations, revealing Mr. Frederick's comings and goings not only in the vicinity of the crime scene, but throughout the entire city of Loveland.

Unlike in *Chatrie,* in which the location information was sought within only a two-hour window*,* here, law enforcement's access to Mr. Frederick's location information spanned the course of a month. And notably, law enforcement in both *Carpenter* and *Chatrie* had the

wherewithal to at least seek a warrant or court order. No such safeguard was afforded Mr. Frederick. Instead, his location data over a thirty-day period was accessed by state and federal law enforcement almost instantaneously, without Mr. Frederick's knowledge or consent, and with no effort, oversight, or threshold showing under the Fourth Amendment.

Although the location information obtained in *Carpenter and Chatrie* was derived from cellphones, the logic extends to detailed location information derived from Flock, as it provides much of the same, if not more, information about an individual's location. As noted in *Chatrie,* "a new technology should not transform what individuals had reasonably thought they could withhold from the Government." 225 L.Ed at 809. Here, in the same way Courts have recognized that phones have become ubiquitous, pervasive, and impossible to disengage from, so too has the expansion of high-powered ALPR cameras like Flock on public roadways. As in *Carpenter* and *Chatrie,* "a person can hardly help but generate a trail of location data," and that person does not know quite what he or she is signing up for by traveling the public roadways. Indeed, that person does not know how frequently and precisely his/her location information can be shared with the Government. *Chatrie* at 816-17. The exposure of that information to Flock, and thus the Government, is the "automatic price" of traveling public roadways now equipped with highly sophisticated surveillance technology like Flock. *Id.* Further, Flock data provides an even more detailed and intrusive record of an individual's movements than cell-site or Google location data. Rather than merely identifying location points, Flock captures high-resolution images that document a driver's precise whereabouts at specific moments in time.

Additionally, the question of whether society is prepared to recognize the expectation of privacy contemplated here as objectively reasonable has been answered with a resounding yes. Public concern over law enforcement's use of Flock's surveillance capabilities has become

increasingly pronounced, with communities, civil liberties advocates, and policymakers calling for law enforcement to end its contracts with Flock or, at a minimum, for the implementation of meaningful oversight, transparency, and safeguards such as warrants. *See* Deborah Grigsby, Noah Festenstein, and Sage Kelley, *As Flock camera network grows, so do privacy and data concerns*, COLORADOPOLITICS (Jul. 19, 2025)[1]; Shaun Boyd, *Crime fighter or mass surveillance? In Colorado, license plate readers are high-tech and widespread,* CBSNEWS (Sept. 22, 2025)[2]; George Chidi, *Creepy surveillance: why some cities are shutting down Flock cameras amid privacy concerns,* THE GUARDIAN (Apr. 6, 2026)[3].

In Colorado, the state legislature recently considered multiple bills directed at curtailing surveillance, including a bill that would have required law enforcement to obtain a warrant to search ALPR databases like Flock. *See* Kiara DeMare, *Colorado could limit police use of Flock and other mass surveillance networks,* CPR News (Feb. 23, 2026).[4] That was, in part, based on outrage that LPD, the same law enforcement agency that utilized Flock in the apprehension of Mr. Frederick, had shared access to its Flock database with U.S. Border Patrol. *See* Spencer Soicher, *Loveland Police has shared access to license plate reader data with Border Patrol, records reveal*, 9News (Aug. 15, 2025).[5]

Despite widespread concern over law enforcement's rampant and unfettered access to Flock's mass surveillance capabilities, the question of whether the government's use of Flock constitutes a search requiring a warrant based on probable cause is a matter of first impression

---

[1]https://www.coloradopolitics.com/2025/07/19/as-flock-camera-network-grows-so-do-privacy-and-data-concerns-37abb64a-924e-581c-af05-b4f0090cbfe8/
[2]https://www.cbsnews.com/colorado/news/crime-fighter-mass-surveillance-colorado-license-plate-readers/
[3]https://www.theguardian.com/us-news/ng-interactive/2026/apr/06/flock-cameras-privacy-concerns?
[4]https://www.cpr.org/2026/02/23/colorado-police-ai-limits-bills-flock/.
[5]https://www.9news.com/article/news/local/local-politics/loveland-police-sharing-license-plate reader-data-border-patrol/73-807d8c95-5904-4b55-be83-27aafee9638d.

unresolved by the 10th Circuit or U.S. Supreme Court. Admittedly, the State and Federal Courts that have considered the question have largely found that queries of ALPR systems do not constitute Fourth Amendment searches. *See, e.g. United States v. Yang*, 958 F.3d 851, 859 (9th Cir. 2020); *United States v. Sturdivant*, 786 F. Supp. 3d 1098, 1107 (N.D. Ohio 2025), U.S. Dist. LEXIS 109054, *15-17 ; *Schmidt v. City of Norfolk*, 2026 U.S. Dist. LEXIS 15235, *3-7;*United States v. Jackson, 2025 U.S. Dist. LEXIS 101960, *2; Rinaldi v. Sylvester*, 2025 U.S. Dist. LEXIS 187115, *46-50; *United States v. Rubin,* 556 F. Supp. 3d 1123, 1129 (N.D. Cal 2021); *but see Commonwealth v. Bell*, Criminal No. CR23-1500, 2024 Va. Cir. Lexis 77, 113 Va. Cir. 316 (May 10, 2024) (finding collection and storage of location information by law enforcement through FLOCK constituted a search requiring a warrant). However, these Courts misunderstood the significant differences between a traditional automated plate reader that merely records a license plate and the highly sophisticated, AI-powered systems like Flock that record and catalog significantly more data about a vehicle that officers can retrospectively search using broad terms and reconstruct an individual's movements from. For example, in *United States v. Floyd*, the district court in Florida held that the query of ALPR cameras was not a search because the license plate readers provided the same information that could have been obtained from simple visual surveillance conducted at the nearby grocery store. 811 F. Supp. 3d 1345, 1350, 2025 U.S. Dist. LEXIS 229044, *11; *see also Schmidt,* 819 F. Supp. 3d at 498 (2026) (taking photos of the license plate of a vehicle on a public roadway does not constitute a search); *United States v. Yang*, 958 F.3d 851, 859 (9th Cir. 2020) (same).

However, this District Court's description is simply not factually accurate. An officer sitting in a grocery store parking lot could not search for any red car that passed the grocery store over the last thirty days and then go back in time and retrospectively plot that vehicle's movements.

The information provided by Flock is qualitatively different and does much more than just capture the text on a license plate. Rather, Flock preserves a searchable catalog of a vehicle, its identifying characteristics, and its movements that any officer can review at a later date.

Additionally, the Courts finding query of ALPR systems were not a search misunderstood the ways in which law enforcement uses this technology in concert with other tools such as other traffic and intersection cameras. *Schmidt.* While a handful of Flock cameras, on their own, may not catalog every single movement, law enforcement *can* catalog every single movement when utilizing the much more sophisticated information gathered from those Flock cameras to bootstrap its surveillance of less advanced traffic and intersection cameras which blanket every street, including those in Loveland.

Importantly, the Courts that have addressed this issue refused to foreclose the possibility that more advanced ALPR systems may cross the constitutional line as the number and capabilities of these networks expand. *See Yang,* 958 F. 3d at 864 (Bea, J., concurring) ("If the technology evolves to engender surveillance capabilities comparable to those in Carpenter, then perhaps in the future a warrant may be required"); *Sturdivant*, 786 F. Supp. at 1114 (citing *Yang,* and stating, "that day might well be on the horizon [as the ALPR surveillance in this case] shows a qualitative leap forward, placing the evidence generated from such technology at risk in the absence of a warrant"); *Schmidt* (discussing the doubt and elusiveness of answering when the precise point is in which government use of ALPR cameras crosses the line to an impermissible warrantless search and stating that the question of whether an ALPR creates too permeating a police surveillance system is not subject to a universal answer because all ALPR systems are not created equal); *Rinaldi v. Sylvester*, No. 24-cv-272, 2025 U.S. Dist. LEXIS 187115, 2025 WL 2682691, at *25 (S.D.N.Y. Sept. 19, 2025) (a more extensive network of ALPR's might infringe upon a reasonable

expectation of privacy).

Indeed, the day has come where this Court should consider the Fourth Amendment implications in light of the Flock technology used in this case. Looking at the data provided in Mr. Frederick's case in comparison to these other cases, it is clear that a Constitutional line has been crossed. In *Rinaldi*, the ALPR system scanned the individual's car 111 times over 2.5 years (an average of about 3-4 scans a month). 2025 U.S. Dist. LEXIS 187115, *25. In *Sturdivant*, the ALPR surveillance yielded 26 photos of the defendant's car in six weeks. 786 F. Supp. At 1114. Here, law enforcement's use of Flock yielded 72 scans of Mr. Frederick's car in just thirty days. Flock's technology has evolved and expanded to the point that its pervasive surveillance capabilities can no longer be reconciled with the Fourth Amendment's protections against unreasonable searches and seizures.

Indeed, today the concerns about Flock surveillance becoming too pervasive and invasive are no longer hypothetical – they are reality. However, the Supreme Court in *Chatrie* also disavowed the logic that the existence of a Fourth Amendment search depends on how pervasive it is. In *Chatrie*, the Court stated:

> "Still more fundamentally, we have never understood Fourth Amendment protections as kicking in only once an intrusion "goes too far." Where the Fourth Amendment applies, it applies—regardless of "the quality or quantity of information" the government obtains. So, for example, this Court held that thermal imaging qualified as a search even though it did not, and was not likely to, detect "private activities" or "intimate details." The Amendment, we analogized, makes "no exception" for the officer "who barely cracks open the front door and sees nothing but the nonintimate rug on the vestibule floor." And likewise, the Amendment does not give agents a pass if their wiretap is of limited duration and thus less likely to intrude on private matters. Indeed, in our seminal wiretap case, the police obtained only 18 minutes of recordings.
>
> That approach makes all the more sense when, as with Location History, officials can select the time-limited set of materials they want from an all-encompassing database. Then, the durational bounds on the data actually acquired do little to address the Fourth Amendment's concern about "a too permeating police surveillance." What creates that concern is that the government can access all of a cell-phone user's movements, in both

> public and private places—that it possesses a virtual panopticon with which to scrutinize its citizens' activities. The sweep of the official invasion is not made less because the government, with the benefit of hindsight, can pinpoint exactly which few hours of movements it wants to review. That feature of accessing location data is, indeed, more a practical benefit to the government than a limit on its intrusive powers.
>
> *Chatrie* at 813-14 (internal citations omitted).

Further, the Court in *Chatrie* noted the "workability issues" of this "once it goes too far" logic raise the question of where to draw the line. Those same workability issues apply here. What number of Flock cameras would go too far? How many times a day must an individual be unwittingly photographed as they travel from their home to the doctor, to a place of worship, or to a civil rights rally before the high powered ALPR system becomes too permeating a police surveillance state? Any attempt to identify the precise point at which Flock's surveillance becomes "too permeating," therefore, is both arbitrary and unnecessary. Instead, the Fourth Amendment requires recognition that once a government possesses and can search a comprehensive database of a person's location information, a warrant is required.

Just as the defendants in *Chatrie* and *Carpenter* had a reasonable expectation of privacy in their location history and movements, so too did Mr. Frederick, whose movements over the course of thirty days, outside the time and area of the crime scene, were meticulously tracked and logged for law enforcement to retrospectively surveil. Accordingly, law enforcement's use of Flock to obtain and analyze Mr. Frederick's location history constituted a search within the meaning of the Fourth Amendment.

*b. By using the Flock System to conduct a warrantless retrospective search of Mr. Frederick's movements, law enforcement violated the Fourth Amendment and the fruits of this warrantless search must be suppressed.*

Law enforcement's search of Flock records for Mr. Frederick's comprehensive movements, without a warrant, is presumptively unreasonable under the Fourth Amendment. The Supreme

Court reaffirmed in *Carpenter* and *Chatrie* that warrantless searches "undertaken by law enforcement officials to discover evidence of criminal wrongdoing" are unreasonable unless they fall within one of the few exceptions to the warrant requirement. *Carpenter* at 316; *Chatrie* at 820-21. No such exception applies here. There was no consent or exigent circumstances, and law enforcement did not have probable cause to search for Mr. Frederick's vehicle movements. Rather, law enforcement used Flock and the resulting location information it obtained as a way of establishing probable cause, in direct contradiction of LPD's own policy and procedure, which mandates that ALPR information "shall not be used as a source of probable cause for law enforcement actions." Having used Flock data to bootstrap the very probable cause it needed to conduct the search in the first place, law enforcement's actions were unreasonable under the Fourth Amendment and cannot be salvaged by any recognized exception to the warrant requirement. Additionally, this case presents an even more compelling basis for requiring a warrant than *Carpenter* and *Chatrie*, where law enforcement at least secured some judicial oversight via warrant or court order before compelling production of the location information. Here, law enforcement obtained neither, searching the Flock database for Mr. Frederick's whereabouts without any judicial oversight whatsoever, in violation of the Fourth Amendment.

Evidence obtained through an unconstitutional search is subject to the exclusionary rule, a doctrine designed to compel respect for Fourth Amendment protections by deterring future violations. *Davis v. United States,* 564 U.S. 229, 237-38 (2011). "To avoid embarrass[ing] the future, courts must carefully and incrementally adapt their Fourth Amendment jurisprudence to advancements in the digital era." *United States v. Carpenter*, 926 F.3d 313, 318 (2019). This wisdom applies equally to the remedial implication of the exclusionary rule. Constitutional protections cannot evolve without the remedies necessary to enforce those protections.

Additionally, the good faith exception does not apply. While the Flock database is new, "the principle covering it is not." *Chatrie* at 820-21. *Carpenter* and its protections for location history were decided long before law enforcement conducted the Flock inquiries on Mr. Frederick's car. *C.f. United States v. Mapson*, 96 F.4th 1323, 1334-1335 (11th Cir. 2024) (not deciding whether *Carpenter* requires a search warrant for ALPR data because the good-faith exception to the exclusionary rule applies where Carpenter decided after the inquiries on defendant's vehicle were made). The Fourth Amendment's answer to powerful new surveillance technologies is not "search first, ask later." It is the same answer that has been clearly established, i.e. when the government seeks a person's location history, it must first obtain a warrant. Because the exclusionary rule exists to deter precisely this type of constitutional intrusion and to remove the incentive for law enforcement to bypass the warrant requirement in the future, all evidence observed and derived from law enforcement's warrantless Flock search must be suppressed.

WHEREFORE, Mr. Frederick moves this Court to find that law enforcement's use of the Flock surveillance system to surveil his movements without a warrant violates the Fourth Amendment, and suppress any evidence derived from its use.

Respectfully submitted this 7th day of August, 2026.

RECHT KORNFELD, P.C.

*s/ Liz DeLay*
Liz DeLay
Kelly L. Page
Richard K. Kornfeld
Attorneys for Defendant Cooper Frederick
1600 Stout Street, Suite 1400
Denver, Colorado 80202
Phone: (303) 573-1900
Fax: (303) 446-9400
rick@rklawpc.com, kelly@rklawpc.com,
liz@rklawpc.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 7th day of August, 2026, I electronically filed the foregoing **Motion to Suppress Evidence Obtained and Derived from Flock** with the Clerk of Court using the CM/ECF system which will send notification of such filing to all listed parties.

*s/ Valerie Lucero*
Paralegal